# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 880 | **DATE** | 5/5/2000 |
| **CASE TITLE** | In Re: Bank One Shareholders Class Actions | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Except for the hereby-confirmed designation of the Wechsler Firm as counsel for the plaintiff class on the terms stated in that firm's successful bid, the other two issues dealt with in this opinion–class certification and designation of the most adequate plaintiffs to represent the class–now remain conditional upon the terms set out in this opinion. As soon as those conditions are addressed by the appropriate parties (respectively by defendants and by the Pension Group), this Court will enter an appropriate further order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

MAY 0 8 2000
date docketed

docketing deputy initials

5/5/2000
date mailed notice

Document Number

SN
courtroom deputy's initials

Date/time received in central Clerk's Office

SN
mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAY 0 8 2000

In re:                                )
                                       )
BANK ONE SHAREHOLDERS CLASS ACTIONS)
                                       )
———————————————————————————————————    )    No.  00 C 880
                                       )
JOHN B. McCOY, THOMAS E. REILLY,       )
JR., RICHARD J. LEHMANN, DAVID J.      )
VITALE, RICHARD W. VAGUE, ROBERT A.)
ROSHOLT, FIRST USA BANK, N.A. and      )
BANK ONE CORP.,                        )
                                       )
               Defendants.             )

MEMORANDUM OPINION AND ORDER

After this District Court's random assignment system had
delivered to this Court's calendar the lowest numbered of what
ultimately became 26 putative securities class actions brought by
shareholders against Bank One Corp. ("Bank One") and a number of
individual defendants, the host of those identical later-filed
actions was added to the mix by appropriate reassignment orders.
Among the several actions that this Court then took were these:

    1.  It issued its February 11, 2000[1] memorandum order
that (a) in part notified the parties that it contemplated
the effective consolidation of all such actions for pretrial

_____

    [1] Because that and all later developments have taken place
this year, the year designation "2000" has been omitted as
unnecessary from here on out.

purposes and for trial (see 15 U.S.C. §78u-4(a)(3)(B)(ii)[2])
and also (b) notified the parties and their counsel in those
underlying actions that as part of its determination of the
member or members of the putative plaintiff class who is or
are "most capable of adequately representing the interests
of class members" (referred to here, as the statute does, as
the "most adequate plaintiffs"[3]) pursuant to Subsection
(a)(3)(B)(i), this Court was contemplating the possibility
of awarding the putative class' legal representation on the
basis of sealed competitive bids (as it had previously done
in an antitrust class action, <u>In re Amino Acid Lysine
Antitrust Litigation</u>, 918 F.Supp. 1190 (N.D. Ill. 1996)).
That latter notification was given in full awareness of the

---

[2]  In fact that order referred to the essentially identical
subsection of 15 U.S.C. §77z-1, a provision of the Private
Securities Litigation Reform Act of 1995 ("Reform Act") that is
applicable to private securities litigation brought under the
Securities Act of 1933.  But this action has been brought instead
under the Securities Exchange Act of 1934, so that the
corresponding provisions of 15 U.S.C. §78u-4 (also part of the
Reform Act) control here.  Further citations to that section will
take the form "Subsection --," dropping the prefatory "15 U.S.C.
§78u-4."

[3]  In fact the statutory reference is to a singular
"plaintiff."  But given the manner in which the name plaintiffs
have appeared in the underlying actions, this opinion will employ
the plural form "plaintiffs."

considerations that have been put into play in securities class actions by the Reform Act (of which 15 U.S.C. §78u-4 is a part).

2. On February 18 this Court issued another order, which was embodied in its oral ruling during that date's status hearing and its memorandum order of the same date, that (a) directed the filing of a single amended complaint on or before February 25, naming as co-counsel all persons or firms who were counsel of record in the numerous underlying lawsuits, and (b) authorized the filing of sealed bids on or before March 10 by counsel seeking to be awarded legal representation of the class (to serve either as class counsel or co-class counsel, with any representation by more than one counsel to be limited by the terms of the bid as to the total fees payable to all counsel).

3. On February 25 this Court dismissed all of the underlying actions in favor of the single Consolidated Class Action Complaint (hereafter simply "Complaint") that conformed to Paragraph 2(a) of this opinion and that had been filed under Case No. 00 C 880.

When defendants then submitted (on the same March 10 due date that this Court had set for tendering the sealed bids by

plaintiffs' counsel) their Joint Motion To Dismiss the
Consolidated Class Action Complaint ("Motion To Dismiss"), this
Court announced that it would defer any decision as to the
designation of the most adequate plaintiffs and as to the award
of class legal representation until the Motion To Dismiss had
been ruled upon. All plaintiffs' counsel listed in the Complaint
(whether or not they had submitted bids) and any other counsel
who had submitted bids were authorized to respond to the Motion
To Dismiss.

Then with those responses in hand, as well as a motion for
leave to file an Amended Complaint that had been submitted by
counsel for the "Pension Group" (a group of shareholders that had
sought designation as the most adequate plaintiff but had not
actually filed its own complaint), this Court ruled orally on
April 18 that the Motion To Dismiss was denied and that
defendants would be required to file an answer addressing the
Complaint's substantive allegations. At this point, then, the
issues of representation by the most adequate plaintiffs and of
the designation of class counsel are ripe for decision.

## Class Certification

Although this Court has not heretofore been in a position to
specify that this action is indeed entitled to be maintained as a

4

class action (the concept adverted to in Fed. R. Civ. P. ("Rule") 23(c)(1), most commonly termed "certification"), any gap in that respect has simply been occasioned by the understanding that such status is not really in serious dispute (with the possible exception hereafter specified). There is surely no question as to the satisfaction of the ingredients of certification that are uniformly shorthanded as "numerosity" (Rule 23(a)(1)), "commonality" (Rule 23(a)(2)) and "typicality" (Rule 23(a)(3)). Nor does there appear to be any question that the requirements of Rule 23(b)(3) are satisfied here. Hence the only potential for rejecting certification would seem to be for a possible lack of adequacy of representation (Rule 23(a)(4))--a subject that by definition could not have been addressed until the most adequate plaintiffs and the class counsel would be identified.

Accordingly this Court hereby conditionally certifies the following plaintiff class (see Complaint ¶37):

> All persons and entities who purchased Bank One's common stock during the period from October 22, 1998 through November 10, 1999 inclusive (the "Class Period") and who suffered damages thereby, excluding only the defendants themselves, members of the families of the individual defendants, any entity in which any defendant has a controlling interest or of which any defendant is a part or subsidiary or is controlled by Bank One, and any of the defendants' officers, directors, affiliates, legal representatives, heirs, predecessors, successors or assigns.

And the only condition that this Court imposes on such
certification is that defendants are required to file in this
Court's chambers on or before May 15 either (1) any objections
that they may have under Rule 23(a)(4) or (2) a statement that
they have no such objections.[4]  If no defense filing were to be
forthcoming either way, defendants will be treated as having
consented to the class certification identified in this
paragraph.

## Most Adequate (Lead) Plaintiffs

As to the determination of the most adequate plaintiffs--the
designation of the lead plaintiffs or group--this Court stated
early on in the proceedings that it was in full agreement with
the views expressed by Honorable David Hamilton in his meticulous
treatment of that subject in Sakhrani v. Brightpoint, Inc., 78
F.Supp.2d 845, 849-54 (S.D. Ind. 1999).  Thus, for example, the
notion reflected in certain of the underlying actions that a
suitable "group of persons" for Subsection (a)(3)(B)(iii)(I)
purposes can comprise individual small-quantity-purchaser

---

[4]  If this Court has been mistaken in its assumptions as to
certification reflected in the text paragraph preceding this one,
defendants' filing may of course include other objections.  If
such is the case, this Court will then determine what if any
response is required from the presumptive class representative or
from class counsel or both.

shareholders who fill page after page of a complaint's listing of class members and their Bank One stock purchases is wholly unpersuasive (see <u>Sakhrani</u>, 78 F.Supp.2d at 853). Indeed, any choice that was based on the number of shares held by such an assemblage of small holders would really subvert the purposes of the Reform Act by maximizing the prospect that the lawsuit would truly be run by the lawyers and not by the client class members (none of whom might have a sufficient amount at stake to justify the necessary investment of time and effort to exercise meaningful control of the litigation).

This Court has examined each of the submissions seeking lead plaintiff status. It finds, based on the statute and on the considerations identified in <u>Sakhrani</u>, that the shareholders identified as the "Pension Group" (now represented by the law firms of Schoengold & Sporn, P.C. and Quinlan & Crisham, Ltd. (for convenience, collectively "Schoengold Firm")) best fit the statutory considerations for presumptive purposes under Subsection (a)(3)(B)(iii)(I). That Pension Group comprises six employee benefit funds whose aggregate purchases during the Class Period came to 77,200 shares (2,000 of those shares were later sold). One of the funds had the largest volume of purchases of any individual purchaser listed in any of the underlying actions

or in any of the lead plaintiff submissions--23,600 shares, including the same 2,000 shares that were later sold. That volume was not only substantially larger than the volume of transactions engaged in by any other Pension Group member (the next largest was something less than 2/3 of that 23,600 share figure) but, significantly, was larger by a much wider margin than the volume of shares bought by <u>any</u> other purchaser listed in <u>any</u> of the other underlying actions, except for the hedge fund purchaser discussed in the next paragraph.

In reaching the just-announced presumptive determination, this Court has been very much aware of the presence of Thales Fund Management, L.L.C. ("Thales"), whose counsel Spector Roseman & Kodroff, P.C. ("Spector Firm") characterizes it "as the presumed most adequate lead plaintiff" because its own large volume of transactions has given rise to a claim of $1.5 million in losses. But as the submission by the Pension Group's counsel has pointed out, Thales is an institutional investment manager (a hedge fund) that engaged in extensive daytrading, first shorting Bank One stock (presumably because it was regarded as overvalued at market price) and then buying to cover the short position. In addition to that trading pattern, of course Thales is not simply a buyer for its own account, standing instead in the place of

whatever number of investors are participants in its managed fund. Taken all in all, this Court does not view that posture as qualifying Thales for the "most adequate plaintiffs" designation in preference to the handful of institutional investors who make up the Pension Group with greater aggregate claimed losses.

Although the members of the Pension Group are thus entitled to presumptive status under Subsection (a)(3)(B) as the most adequate plaintiffs, a simple example--though framed for illustrative purposes to present a substantial contrast--will demonstrate why that rebuttable presumption does not necessarily control. Suppose for instance a plaintiff in such a presumptive status has agreed that its own lawyers, if acting as class counsel, are to receive one-third of any class recovery. Suppose further that another highly reputable law firm that has appeared of record for another putative plaintiff or plaintiffs, having demonstrated excellent credentials in earlier securities class action litigation and being clearly capable of handling the complexities of the current lawsuit, is willing to handle the case for half of that percentage fee--or to provide even a greater contrast, is willing to work for that lesser percentage and also to impose a cap on the firm's total fee payment. In that circumstance the presumptive lead plaintiff could certainly

bind _itself_ contractually to pay one-third of _its_ share of the
class recovery to its own lawyer, but any court would be remiss
if it were to foist that one-third contingency arrangement on all
of the other class members who had not themselves chosen that law
firm to be their advocate.

To this Court that would signal the adoption of one of two
alternatives. It should be remembered that although Subsection
(a)(3)(B)(v) provides that the most adequate plaintiffs may
"select and retain counsel to represent the class," that
opportunity is expressly made "subject to the approval of the
court." In this Court's view, if the presumptive lead plaintiffs
were to insist on their class counsel handling the action on the
hypothesized materially less favorable contractual basis, that
insistence would effectively rebut the presumption that the
putative class representatives, despite the amounts that they
have at stake personally, were indeed the "most adequate
plaintiffs"--that is, the class members "most capable of
adequately representing the interests of class members"
(Subsection (a)(3)(B)(i)). If on the other hand the presumptive
class representative were willing to be represented by the most
favorable qualified bidder among the lawyers submitting bids,
with that bidder either supplanting the presumptive lead

plaintiff's original choice of counsel or working together with that original counsel (but with the total lawyers' fees to be circumscribed by the low bidder's proposal), the presumption would clearly remain unrebutted and the presumptive most adequate plaintiffs would properly be appointed as lead plaintiffs.

## Designation of Class Counsel

### Use of the Bidding Process

With that understanding, this opinion approaches the analysis of the nine previously sealed bids that it has received from counsel seeking to represent the class. Although the Reform Act has introduced into the analytical matrix the refinement discussed in the preceding section, the same considerations that led this Court to employ the sealed bidding process as the basis for awarding a class' legal representation in the Lysine litigation (see 918 F.Supp. at 1192-97) call for the same result here. In terms of the maximum benefit to the class--unquestionably the preeminent consideration for any court called upon to act as the effective "surrogate client" in the choice-of-counsel decision--that procedure is superior to any alternatives that the caselaw or other authorities have entertained.[5]  Indeed, the

---

[5]  It is certainly worth mentioning that the result in Lysine was that the successful bidder among the competing law

reasons expressed for that conclusion in <u>Lysine</u> seem to this Court to be further reinforced by the recent thoughtful discussion in <u>Goldberger v. Integrated Resources, Inc.</u>, No. 99-7198, 2000 WL 320447 (2d Cir. Mar. 28), which in the course of holding that either the lodestar approach or percentage-of-the-recovery method may properly be used to calculate fees in common fund cases, nonetheless identified the deficiencies of each of those methods in failing to replicate the free market for legal services (see, e.g., <u>id</u>. at *9):

> We agree that many class actions serve a useful purpose, that lawyers who successfully prosecute them deserve reasonable compensation, and that market rates, where available, are the ideal proxy for their compensation. The problem is that we cannot know precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel.

As this Court and other proponents of the sealed bidding process have emphasized, if that process evokes a significant number of

---

firms ultimately received something in the range of just 6% of the total class recovery of well over $50 million--meaning that the class members realized about 94% of what the defendants had ultimately paid in settlement. That meant the plaintiff class was somewhere between $5 million and $10 million better off in pocket than would have been true in the typical lead counsel-liaison counsel-counsel committee arrangement, with scads of lawyers feeding at the trough.

bids from well-qualified law firms or law firm combinations it is best calculated to provide precisely the efficient market information that serves as the "ideal proxy" for the one-to-one lawyer-client agreement in conventional litigation.

As in Lysine, 918 F.Supp. at 1197-1201, this opinion will follow an arbitrary alphabetical order in describing the proposals of the nine bidders. It should be mentioned at the outset that in an effort to maximize the potential for ultimate benefit to the class members, this Court (again as in Lysine) did not set its own structural standards for the bids. In that respect, any bidding constraints that this Court (not having more than threshold knowledge of the litigation and its prospects) might have imposed from the outside in the form of mandated structural limitations would necessarily have generated corresponding limitations on the exercise of imagination by bidding counsel in devising proposals that they thought would provide the maximum benefit to the class, while at the same time providing the successful lawyers with adequate compensation. That will become more evident when the wide-ranging proposals are revealed in the ensuing discussion. At the same time, the type of variation that the absence of such constraints has produced among the several proposals will necessitate some later

assumptions by this Court about the potential class recovery in the process of comparing bids. There too this opinion will explain any assumptions so made. Now to the bids themselves.

## Analysis of the Competing Bids

Berger & Montague, P.C. and Keller Rohrback L.L.P. (for convenience, collectively "Berger Firm") propose to charge 20% of the first $5 million recovered, plus 15% of the next $10 million and 10% of the next $10 million, with their fees capped at $3.5 million if more than $25 million were to be recovered before fact discovery is closed. Any recovery in excess of $25 million after the close of discovery would be compensated at a 15% rate, with successive caps to be applicable depending on the stage that the litigation will have reached at the time of final recovery. There is no need to detail the bid further, because at every level of recovery for the plaintiff class that bid would cost the class more in lawyers' fees than the bid from Wechsler Harwood Halebian & Feffer LLP ("Wechsler Firm").[6]

Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Firm")

---

[6] Although the alphabetical approach defers the discussion of the Wechsler Firm bid to later in this opinion, it will be said now that it proves to be the most favorable to the class clients. Hence the Berger Firm's and others' bids will be placed alongside that yardstick for comparison purposes later.

would charge 15% of the first $50 million recovered, 12.5% of the next $50 million, 7.5% of the next $50 million and 5% thereafter. That bid not only failed to include any cap on fees (as was included in the Wechsler Firm bid among others), but the Cohen Firm's crossover point with the Wechsler Firm bid occurs at the $8.33 million class recovery level.[7]

Krislov & Associates, Ltd. ("Krislov Firm") has submitted a bid in tabular form that provides for varying percentages of fee payments at different levels of recovery at differing stages of the litigation ("document stage," "deposition stage," "trial" and "appeal"). At its bid's most favorable level (the document

---

[7] As its label suggests, the "crossover point" for any competitive bid as against the yardstick bid occurs when such a competitive bid, which would produce a larger net amount for the class at a lower level of recovery (whether by way of settlement or litigation), becomes equal to the yardstick bid in terms of the net class recovery. As a necessary element of that condition of equality defining the "crossover point," any recovery greater than that crossover figure must bring more net dollars to the class under the yardstick bid than it would under the competitive bid. It is a simple matter to devise the necessary inequality formulations for determining such crossover points, and this Court has done so as to each of the five competitive bids that require such added analysis. To put the concept differently (and in a way less comparable to trying to describe a helix with your hands behind your back), suppose that the two bids were plotted on a graph, so that the yardstick bid became a horizontal line after it reached its cap on fees, while the competitive bid continued to have an upward slope. In those terms the crossover point would literally be the point of intersection of the graphic depictions of the two bids.

stage), Krislov Firm would charge 20% of the first $10 million recovered, 15% of the next $10 million, 10% of the next $5 million and 2.5% for any recovery in excess of $30 million, but with a $5 million cap in any event. As with the Berger Firm bid, the Krislov Firm bid is less favorable than the Wechsler Firm bid at every level of potential recovery.

Lowey Dannenberg Bemporad & Selinger, P.C. ("Lowey Firm") also submitted a bid in tabular form. Because the first litigation stage identified in that bid had covered the period from initial pleading through a motion to dismiss, and because this Court's April 18 denial of defendants' Rule 12(b)(6) motion has brought this action past that point, the next identified stage ("after motion to dismiss through adjudication of summary judgment") will be looked at here (all later stages actually increase the stated percentages). In those terms Lowey Firm would charge 15% of the first $20 million recovered, 12.5% of the next $30 million and declining percentages for any greater recovery. Because the Lowey Firm bid set no cap on fees, while the Wechsler Firm bid did so, it is unnecessary to set out further stages of the Lowey Firm proposal. Instead all that need be said for later comparison purposes is that the crossover point here (as with the Cohen Firm bid) is at the $8.33 million mark.

16

Schoengold Firm's bid (it will be recalled that the two law firms encompassed within that label are those that represent the Pension Group, the presumptive most adequate plaintiffs) have also submitted a bid in tabular form, with the first column referring to the now-mooted "pleading to motion to dismiss" stage. Any comparative analysis relating to the Schoengold Firm bid is rendered more difficult by the fact that it proposes very small percentages for the period "through document discovery," while increasing those percentages dramatically at the next phase (described as "deposition discovery through summary judgment motion"). In the first discovery stage Schoengold Firm would charge 4.25% of the first $100 million recovered and diminishing percentages thereafter, while if the case were not disposed of until the next phase (when deposition discovery had begun) the fee charged would be 10% of the first $100 million and lesser percentages thereafter. In terms of the later-discussed $2.75 million cap on the Wechsler Firm fees, the two crossover points with the Wechsler Firm bid would be $64.7 million during the first discovery phase or $27.5 million during the second discovery phase.

Spector Firm has tendered a somewhat unusual bell curve proposal, divided (unlike Gaul) into two parts--one a pretrial

17

fee, the other a fee applicable once trial starts. Only the first stage, involving lower percentages, will be set out here.[8] At that stage counsel would charge 5% of the first $5 million recovered, 10% of the next $5 million, 15% of the next $5 million, 20% of the next $10 million, then 15% of the next $10 million (the amount between $25 million and $35 million in total recovery), 10% of the next $15 million and 5% of any recovery in excess of $50 million. No cap is placed on the Spector Firm fee. Again there are two crossover points with the Wechsler Firm bid, one at about $24.3 million before trial and the other at $17 million after trial begins.

As for Wechsler Firm itself, its proposal is to charge 17% of the first $5 million recovered, 12% of the next $10 million and 7% of the next $10 million, with no fee charged for any amount recovered in excess of $25 million (thus setting a cap of $2.75 million on the total fees). Wechsler Firm has also added a respectful request for this Court's consideration of a possible bonus fee if more than $25 million were recovered--a notion drawn from this Court's statement in Lysine, 918 F.Supp. at 1199 that

---

[8] At every level of recovery, the fee imposed after trial begins would tack another 5% of the recovery onto the fee (so that 5% pretrial becomes 10% once trial begins, 10% becomes 15% and so on).

(to discourage any possible temptation for counsel to settle too early and for an inadequate amount in light of the self-imposed cap on fees) it would consider that possibility of granting an additional fee award so long as the fee award would still "leave the class meaningfully better off financially than under any of the other original bids" (id.).

Next, Weiss & Yourman ("Weiss Firm") initially got off to an impermissible start, not only by submitting four alternative fee proposals that approached the structuring of the fee award from as many different directions, but also by then stating:

> The Firm expresses no preference for any of these four alternatives and the alternatives do not appear in any particular order. The Firm makes these alternative proposals to allow The Court to choose the recovery theory which The Court finds most appropriate. Further, the Firm is open and willing to negotiation of these fee structures or to alternative fee structures.[9]

After this Court summarily rejected that approach (or more accurately, those approaches), Weiss Firm tendered a revised proposal containing a single bid that called for a fee of 12% of

---

[9]   [Footnote by this Court]  That presentation of course violated both the spirit and the letter of this Court's invitation for competitive bidding, both by rendering it effectively impossible to compare the Weiss Firm submissions with those of other bidders and by seeking to place this Court in the totally inappropriate position of playing the actual client in a negotiation posture.

the first $20 million recovered and 17% of the next $19 million, with a cap of $5.63 million. That superseding bid has a $20 million crossover point with the Wechsler Firm bid.

Finally, Wolf Haldenstein Adler Freeman & Herz ("Wolf Firm") submitted a bid calling for a fee of 20% of the first $5 million recovered, 15% of the next $10 million and 10% of the next $15 million, with no fees to be charged for any recovery in excess of $30 million (thus setting a $4 million cap on fees). As with two of the other bids, that would cost the plaintiff class more than the Wechsler Firm bid at every level of possible recovery.

<u>Selection of the Successful Bidder</u>

Because of the existence and the differing amounts of several crossover points of other bids in comparison with the Wechsler Firm bid, it becomes necessary (as stated earlier) to make some assumptions about the prospects of recovery for the class. Needless to say, that poses real problems of predictability. No one is provided a crystal ball for that purpose, and even if one were available there could be no assurance that it was unclouded. There are however two factors with which the analysis can fairly begin:

1. As stated earlier, the Complaint has survived defendants' Motion To Dismiss. In simple terms, the

plaintiff class has stated a viable claim if it can deliver as has been advertised in the Complaint's allegations.

2. Although there have been varying estimates of the potential class recovery if plaintiffs were totally successful in this lawsuit (an assumption of such total success is the starting point for the well-known Lloyd's of London approach to evaluating litigation[10]), the best-informed number--articulated and explained by counsel during the March 15 status hearing--appears to be in the $4.6 to $4.8 <u>billion</u> range.

In those terms all of the various crossover points of other bids in relation to the Wechsler Firm bid drop out of significance at very low levels of probability of success--even the highest crossover figure of nearly $65 million under one of the alternatives represented by the Schoengold Firm proposal amounts to evaluating the plaintiff class' chance of prevailing at less than 1.5%.[11] Moreover, even in that respect it will be

---

[10] See Appendix.

[11] This Court of course recognizes the overly simplistic nature of that raw number. Any attempt at a more sophisticated analysis would necessitate separate determinations of the probability of total victory by the class (which would then be multiplied by the $4.6 to $4.8 billion recovery figure) and of the various probabilities of lesser levels of success (each of

21

recalled that the Schoengold Firm's initial low percentages of recovery apply only if the case is settled before depositions begin, at which stage the crossover point drops to $27.5 million.

It is of course worth reemphasizing that what has been said here is not at all a prediction that the plaintiff class will necessarily recover any particular amount, either by being successful at trial or by defendants coughing up that much in settlement--nor of course is this a prediction that the class will prevail at all. Instead, with assumptions being essential to the process, what is set out here surely appears reasonable in

---

which would have to be multiplied by the amount of recovery at that level), with the composite likelihood of recovery being derived from the sum of those determinations. But at this threshold stage no such fine tuning is possible, and the ballpark 1.5% figure is so far below anything that experience teaches as the probabilities of success or failure in any serious litigation as to compel the conclusion announced in this opinion. Anyone who has any familiarity with the risks of litigation, of figuratively rolling the dice on an all-or-nothing basis rather than taking the most-often-pursued path of settlement that concludes the vast majority of civil lawsuits, knows that ascribing a 70 to 1 chance to the prospect of winning (or losing)--viewed at the outset of a case--defies reality. To pursue the "rolling the dice" metaphor, this Court recalls the line--either from the movie Guys and Dolls or from the Damon Runyon short story from which the movie and Broadway play were derived--in which gambler Nathan Detroit says something along the lines of:

> Nothing in life is 3 to 1. Most things are 6 to 5 and pick 'em.

relation to defendants' multi-billion dollar exposure.

In summary, then, the Wechsler Firm is entitled to be
designated as class counsel--if, of course, it qualifies as a
responsible bidder in terms of its credentials and experience
(see Lysine, 918 F.Supp. at 1200-01). To that end this Court has
reviewed that firm's curriculum vitae with care, as it has indeed
done with the similar resumes of all of the bidding firms, and it
is well satisfied on that score. Because both the Wechsler
Firm's fee proposal and its firm resume provide the requisite
highly meaningful and persuasive input in all of the relevant
areas, and because there is really no need for this opinion to
elaborate on what has been said there,[12] photocopies of both are
attached to this opinion.

Finally, it has earlier been recognized that the results
announced here pose a possible degree of tension because of the
surface divergence between (1) designating the Pension Group as

---

[12] But it is worth mentioning, as the fee proposal points
out in part, that the highly detailed complaint in the underlying
action brought by the Wechsler Firm on behalf of its putative
class representative was not only the earliest one filed (not of
itself a significant factor--the winner in a race to the
courthouse is not entitled to any special consideration), but
more significantly it served as the model for virtually every one
of the more than 20 actions that followed and for the ultimate
consolidated Complaint that has survived the Motion To Dismiss.

presumptive lead plaintiffs (remember that the Pension Group has entered the proceedings with two other law firms acting as its counsel) and (2) designating the Wechsler Firm as the successful bidder for the class counsel position. It should be said parenthetically that there is certainly no question that the Schoengold Firm personnel would also have qualified as responsible bidders if they had been successful in submitting the low bid (because there is no need to burden the environment by reproducing in published form the detailed statements of the unsuccessful bidders' background experience and of the biographical material about the lawyers in those firms, the curriculum vitae of the two law firms representing the Pension Group will simply be attached to the file original of this opinion but will not be included in the copy submitted for publication).

But that is not really the point. What *is* relevant is that with the Wechsler Firm having shown itself to be a highly responsible and well-qualified law firm that is prepared to handle this litigation on the basis that promises to produce the optimum results for a successful plaintiff class, the Pension Group cannot convert its presumptive lead plaintiff status into a final designation unless it were to confirm its willingness to

accept the Wechsler Firm as class counsel on the basis of its bid.

It should however be made clear that the just-stated requirement does not compel the Pension Group's total abandonment of its originally-selected counsel--counsel in whom it obviously has confidence. Because the successful low bid really defines the total <u>amount</u> of attorneys' fees that the plaintiff class members will bear out of any recovery obtained from defendants, and because those fees will not be a function of how many or which lawyers perform the legal services for the class, this Court sees no problem whatever if the Pension Group were to elect (for example) to work with both the Wechsler Firm and the Schoengold Firm as co-counsel on a basis mutually acceptable to both firms, rather than the Pension Group being compelled to dissociate itself entirely from its originally-chosen counsel. Indeed, any such combined legal forces would represent a modest variant on the most frequently encountered array of lead counsel (often a team effort), liaison counsel and so on in this class of litigation.

If that co-counsel arrangement were to be chosen, of course, it must be understood that the Wechsler Firm would have the lead in allocating the lawyers' respective responsibilities and

assignments--so that its successful bid could not be subverted by its being relegated to a secondary role in the lawsuit (and hence in its level of compensation).[13] This Court will simply await the decision of the Pension Group before this Court can make the final designation of lead plaintiff, with the expectation that word from the Pension Group on that score will come swiftly.

## Conclusion

Except for the hereby-confirmed designation of the Wechsler Firm as counsel for the plaintiff class on the terms stated in that firm's successful bid, the other two issues dealt with in this opinion--class certification and designation of the most adequate plaintiffs to represent the class--now remain conditional upon the terms set out in this opinion. As soon as

---

[13] One additional comment is in order on this subject of counsel's efforts. Marvin Miller, Esq. (whose firm, Miller Faucher & Cafferty LLP, had been listed as co-counsel in a majority of the underlying actions) undertook the responsibility of preparing the Consolidated Class Action Complaint that has superseded the original group of individual complaints. It would obviously be unfair to impose that as a labor of love on the part of lawyers who thus served the common weal by providing services that benefited all of the prospective class representatives. Accordingly, if the lead plaintiffs were to elect not to make further use of the services of attorney Miller and his firm (though the Wechsler Firm is free to reach an understanding for their further involvement), it is expected that they will be fully compensated, whether out of any recovery or from plaintiffs collectively, for their services that antedated the designations of the lead plaintiffs and of class counsel.

those conditions are addressed by the appropriate parties

(respectively by defendants and by the Pension Group), this Court

will enter an appropriate further order.

Milton I. Shadur
Senior United States District Judge

Date:   May 5, 2000

So far as this Court is aware, the late great District Judge Hubert Will (to whose place on this District Court bench this Court has the honor to have succeeded when Judge Will took senior status) originated the "Lloyd's of London" term to describe the most productive vehicle for settling both simple and complex litigation. And if Judge Will was not in fact responsible for coining the term, he was assuredly the most active advocate of that approach, embodying it in his extensive training of fledgling judges around the country over the years.

As might be guessed, the approach derives its name from the proposition that a hypothetical insurer that would be called upon to insure a litigation defendant against an adverse verdict in the lawsuit against that defendant would charge a premium that (disregarding loading costs and the insurer's expected profit, both of which it is fair to ignore for purposes of the hypothesis that the approach is intended to implement) would discount the plaintiff's maximum potential recovery by that plaintiff's risk of losing the case. So for example, if a plaintiff could fairly be viewed as having a 60% likelihood of winning an action in which total success would bring it a $1 million verdict against its defendant, the insurance company's premium for indemnifying that defendant against losing the lawsuit would be $600,000.

To test that premise in the context of an insurer playing the classic insurance role of spreading risks, suppose that the same insurer were to cover ten such lawsuits having those identical characteristics. It would then have charged the ten defendants $6 million in total premiums ($600,000 each). In turn, as a matter of simple probabilities, six of the ten plaintiffs would be expected to recover $1 million each, so that the insurer would also have to pay out $6 million to indemnify the defendants that had been found liable (again remember that the loading costs and insurer profits are being ignored because not relevant to the hypothetical analysis at work here).

Based on that line of analysis, the most appropriate ex ante settlement figure for both plaintiff and defendant in that hypothetical scenario would be that same $600,000 figure. In that respect, among its other virtues (in addition to replacing an amorphous kind of "What's this lawsuit worth?" mental exercise with something more systematic), the Lloyd's of London approach to settlement has the advantage that knowledgeable and experienced lawyers on both sides of a litigation, when asked what the plaintiff is likely to recover if it is entirely successful, will almost always come up with numbers that are quite close to each other. Material divergence most often comes

when the opposing counsel are asked the other related question of evaluating their chances of winning or losing the lawsuit. This Court's experience over the years in settling cases has been that the separation of the analysis into those two components makes it much easier to bridge the gap between plaintiffs' counsel and defense counsel by pointing out the comparative strengths and weaknesses of their respective positions (most often by this Court using a shuttle system of separate meetings, having obtained the consent of counsel to that procedure).

Although the issue that is under consideration in this opinion is of course not the possible settlement of this litigation, the present need to look at the potential "value" of the lawsuit to the plaintiff class (so as to make an appropriate comparative evaluation of the bids for legal representation) implicates the same considerations. Hence the "Lloyd's of London" approach has obvious utility here as well.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In re Bank One Shareholders Class Actions<br><br>This Document Relates to:<br>All Actions | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 00 C 880

Hon. Milton I. Shadur

## LEAD COUNSEL PROPOSAL FROM WECHSLER HARWOOD HALEBIAN & FEFFER LLP

On February 18, 2000, the Court conducted a status conference to consider, among other things, the appointment of lead plaintiff and lead counsel. At the conference, the Court indicated an intent to select lead counsel pursuant to a competitive bidding process. Wechsler Harwood Halebian & Feffer LLP ("Wechsler Harwood") submits this proposal to become Lead Counsel pursuant to the Court's directive at the February 18th conference and the Court's Order of even date.

### 1.  **Wechsler Harwood's Fee Proposal**

Unlike many other class actions, this lawsuit did not begin with a startling public disclosure triggering the filing of numerous shareholder complaints. Rather, Wechsler Harwood, on behalf of our client, Walter Lebensohn, thoroughly researched the factual predicate and prepared a comprehensive, detailed complaint. That pleading was filed on December 14, 1999. Lebesohn, et ano. v.

McCoy, et al., 99 C 8120 (N.D. Ill.). The 20 shareholder actions filed after Lebensohn in each instance were either in haec verba copies or closely derivative of the Wechsler Harwood complaint. Indeed, the Lebensohn complaint served as the basis for the recently-filed consolidated pleading.

In light of Wechsler Harwood's efforts in commencing this action, and, as discussed below, our qualifications and past successes, we believe that Wechsler Harwood is uniquely qualified to serve as Lead Counsel in this complex securities action. Accordingly, we propose the following fee structure in connection with lead plaintiffs' prosecution of the captioned action:

a. 17% of the first $5 million recovered;

b. 12% of the next $10 million recovered; and

c. 7% of the next $10 million recovered.

Plaintiffs' counsel will not receive a fee for any amount recovered in excess of $25 million. Thus, the foregoing structure establishes a ceiling on class counsel fees of $2.75 million. However, if we, as Lead Counsel, successfully recover more than $25 million, we would respectfully request that the Court consider awarding a bonus fee, so long as the ultimate fee awarded "leave[s] the class meaningfully better off financially than under any of the other original bids . . . ." In re Amino Acid Lysine Antitrust Litig., 918 F. Supp. 1190, 1199 (N.D. Ill. 1986).

Wechsler Harwood has the resources to finance this

litigation through trial, and is committed to its prosecution to a successful outcome. We are mindful that in litigating aggressively the class's claims, out-of-pocket expenses will be incurred. However, at this early stage of the proceedings, there are too many variables that can affect how much money counsel will spend to prosecute this action. Therefore, because we are unable to calculate a precise ceiling on expenses, we will submit periodic expense reports for the Court's review to demonstrate that the action is being prosecuted on a cost-effective basis. Amino Acid Lysine, 918 F. Supp. at 1200. In this way, the Court can monitor the out-of-pocket expenses incurred and ensure that such expenses are not depleting unnecessarily any recovery achieved for the class.

2.   **About The Firm**

Wechsler Harwood is dedicated to and highly skilled in prosecuting socially useful actions on behalf of shareholders, consumers, individual investors and small businesses in both federal and state courts. Wechsler Harwood specializes in representing clients in class action securities and antitrust litigation; shareholder derivative suits; matters of corporate governance; consumer protection; employment discrimination; and commercial law. The firm's diligence and high level of competence in these specialized areas have earned us an excellent reputation among our peers and have been recognized by the courts.

The professional competence and diligence of Wechsler Harwood is reflected in the commitment its attorneys have to litigate a case through trial in order to achieve the maximum result possible. This commitment was highlighted by Wechsler Harwood's conduct as plaintiffs' lead trial counsel in Sidney Morse, et al. v. Abbott Laboratories, et al., 90 C 1982 (N.D.Ill.). This highly complex securities class action was vigorously pursued on a contingent basis for nearly four years and culminated in a $15.3 million jury verdict in favor of the plaintiffs and a nationwide class of investors in the securities of Abbott Laboratories. Shortly after the verdict was rendered, the plaintiffs agreed to settle the action in exchange for the creation of a $14.1 million settlement fund and defendants' withdrawal of their appeal and ancillary post-verdict motion practice.

Wechsler Harwood's resolve to litigate an action to trial, if necessary, begins with one of its founding members, Stuart D. Wechsler. Mr. Wechsler prosecuted Van Gemert v. Boeing, 66 Civ. 1820 (S.D.N.Y.), one of the earliest actions maintained as a class action under the then-newly amended Federal Rules of Civil Procedure (259 F. Supp. 125 (S.D.N.Y. 1966)) and, at the time, one of the few securities class actions to proceed to trial and judgment.

Robert I. Harwood, another founding member of the firm, and lead attorney responsible for this action, has litigated a

number of securities class actions to trial. For example, Mr. Harwood was part of the trial team that prosecuted <u>Panter v. Marshall Field</u>, Consol. 78 C 537 (N.D. Ill.), a class action brought under the federal securities laws. Mr. Harwood was co-lead counsel for the class in <u>NCR Corp. v. American Tel. & Tel. Co.</u>, 761 F. Supp. 475 (S.D. Ohio 1991), a plenary hearing commenced under the federal securities laws. Mr. Harwood also has litigated multiple securities arbitrations before the New York Stock Exchange, Inc.

Another founding member of the firm, Joel C. Feffer, also prosecuted a number of securities actions to trial. For example, Mr. Feffer was on the trial team that prosecuted <u>Kreindler v. Sambo's Restaurant, Inc.</u>, 79 Civ. 4538 (WK) (S.D.N.Y. 1986), a securities class action that was settled after seven weeks of trial. Mr. Feffer also litigated <u>Titan Group, Inc. v. Faggen</u>, 513 F.2d 243 (2d Cir. 1975), a securities action through trial, recovering more than $5 million for his client.

Matthew M. Houston, a member of the firm, has litigated a number of private actions to trial. For example, Mr. Houston litigated <u>Vivace v. Gagnon Stone & Gravel</u>, (Sup. Ct. Mass. 1991), a breach of contract and collateral estoppel action to a successful resolution after approximately two weeks of trial. Mr. Houston also litigated <u>Hamos v. Nantucket Conservation Commission</u>, (Sup. Ct. Mass. 1990), a zoning action, to a successful result after

three days of a bench trial. Finally, Mr. Houston prosecuted _Delprete v. DeLonghi, SPA_, (Sup. Ct. Mass. 1992), a product liability action, to a successful conclusion after approximately one week of trial.

Two other members of the Firm, John Halebian and Jeffrey M. Haber, who is also responsible for litigating this action, have extensive experience arbitrating securities claims before various self-regulatory agencies. Similarly, partner James G. Flynn, was a member of the trial team that successfully prosecuted _Bear Stearns, et al. v. Jardine Strategic Holdings, Ltd._, (Sup. Ct. N.Y. County 1988), in a three week jury trial.

Though Wechsler Harwood is committed to prosecuting a case through trial, we recognize that sometimes the optimal result achievable often comes on the eve of trial. For example, in _Maupin v. Commercial Life Ins. Co._, C.A. No. 89-2173 (D.N.J. 1991), Wechsler Harwood obtained a multi-million dollar settlement shortly before trial that constituted in excess of 90% of the damages sought. More recently, Wechsler Harwood, as lead trial counsel in _In re JWP INC. Securities Litigation_, 92 Civ. 5815 (S.D.N.Y.), recovered in excess of $37 million on behalf of a class just weeks before a jury trial was scheduled to commence.

For the Court's ready reference, we are attaching a copy of the firm's biography.

## Conclusion

Wechsler Harwood, as demonstrated above, brings to this action experience, knowledge, and a national reputation for successfully litigating through trial securities class action lawsuits on behalf of aggrieved shareholders.

Wechsler Harwood submits that our Lead Counsel fee structure proposal will ensure that the best interests of the class will remain paramount. Accordingly, Wechsler Harwood respectfully requests that the Court appoint us Lead Counsel to prosecute this consolidated action.

Dated:   New York, New York
         March 8, 2000

                                Respectfully submitted,


                          By: _____
                                Robert I. Harwood
                                Jeffrey M. Haber
                                Frederick W. Gerkens, III
                                WECHSLER HARWOOD HALEBIAN
                                   & FEFFER LLP
                                488 Madison Avenue, 8th Floor
                                New York, New York  10022
                                Phone: (212) 935-7400

# WECHSLER HARWOOD HALEBIAN & FEFFER LLP
## FIRM RESUME

Wechsler Harwood Halebian & Feffer LLP ("Wechsler Harwood" or the "Firm") is a firm that specializes in complex, multi-party litigation with an emphasis on securities class actions, shareholder derivative suits, and securities arbitrations. The Firm also handles more general complex commercial litigation involving allegations of breach of contract, breach of fiduciary duty, fraud, and negligence, as well as litigation involving consumer fraud, anti-competitive conduct, and other commercial claims.

The Firm is dedicated to prosecuting socially useful actions in the most efficient manner and with the highest level of professional competence. The structure of the Firm allows us a far greater degree of independence, flexibility, and satisfaction than a large firm environment, without sacrificing the quality of representation necessary to successfully litigate complex actions throughout the country. The Firm maintains an excellent reputation -- among both the plaintiffs' and defense bars. Our adversaries and co-counsel know that we will go to trial, if necessary, to achieve a satisfactory result for our clients.

Wechsler Harwood has been acknowledged by courts and by its peers to be one of the leaders in the plaintiffs' derivative and securities class action bar. In this regard, we have developed new law in the areas of tender offers, fiduciary duty of corporate insiders to public shareholders in mergers and takeovers, and general principles of required disclosure to shareholders in public companies and to institutional lenders.

As a result, the Firm has been designated as lead or co-lead counsel, liaison counsel, special counsel, or a member of executive and steering committees in numerous complex

cases and other actions involving shareholder rights and corporate governance. In the vast majority of such actions, the Firm's skill and expertise has led to the recovery of substantial monetary and equitable benefits for investors, stockholders, corporations, and partnerships. By way of example, the following litigated actions, in which the Firm served in a leadership capacity, were all brought to highly successful conclusions: 1) In re First Capital Holdings Corporation Financial Products Securities Litigation, MDL 901 (C.D.Cal.) (restoration of over $1 billion in insurance policies and benefits); 2) In re JWP INC. Securities Litigation, (S.D.N.Y.) (creation of settlement fund in excess of $37 million); 3) In re Prudential Bache Energy Income Partnerships Securities Litigation, MDL 880 (E.D.La.) (creation of settlement fund in excess of $90 million); 4) Katz, et al., v. Hay, (S.D.N.Y.) (creation of a $9.5 million settlement fund for purchasers of various securities of the LTV Corporation prior to its bankruptcy filing); 5) Sidney Morse, et al. v. Abbott Laboratories, et al., (N.D.Ill.) (creation of a $14.1 million settlement fund following a jury verdict for plaintiffs); and 6) Bush v. FDI Group, et al., (Fla. Circuit Ct.) (Partial settlement of a class and derivative action on behalf of investors in the Prime Plus Realty Limited Partnership in exchange for defendants' creation of a settlement fund of over $17 million).

**The Attorneys Of The Firm**

The efforts of Stuart D. Wechsler, the senior partner in the Firm, in the area of securities litigation have received considerable judicial comment. U.S. District Court Judge Alvin K. Hellerstein commented in Doney v. Command Systems (98 Civ. 3279), in an opinion dated August 10, 1999, "I don't think it needs my comment to note that, Mr. Wechsler, you are a senior and most respected and most competent member of the securities class action bar. I would take

it as a given your hours are worth the rates that you charge and that the hours that you have put in reflect the efficiency with which you work." In a report dated May 23, 1977, in Bucher v. Shumway, 76 Civ. 2420 (S.D.N.Y.), United States Magistrate Leonard Bernikow stated that "Stuart Wechsler . . . is a leading expert in securities class action litigation."

In Langert v. Q-1 Corporation, [1973-74 Tr. Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,445 (S.D.N.Y. 1974), a case that Mr. Wechsler prosecuted while at his prior firm, Goodkind, Wechsler, Labaton & Rudoff, Judge Carter of the Southern District of New York stated in a decision certifying the class:

> Counsel for plaintiff are experienced in securities law and class action litigation and will adequately protect the interest of the class.

Judge Lasker, in Rosengarten v. International Telephone and Telegraph Corp., [1981 Tr. Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,876 (S.D.N.Y. 1981), an action in which Mr. Wechsler supervised Goodkind, Wechsler's participation on behalf of the plaintiff class stated:

> [C]ounsel [are] attorneys of experience and repute in the field of stockholder and derivative actions . . . they served the corporation and its stockholders with professional competence, "admirable diligence", imagination and tenacity. They contributed to the improvement of the company's procedures and performed a service to both the company and to the stockholders.

Mr. Wechsler also led the team of attorneys that successfully prosecuted the class action, Park Lane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979), to a landmark decision in federal civil procedure. He was also the responsible partner in Van Gemert v. Boeing, one of the earliest actions maintained as a class action under the then newly amended Federal Rules of Civil Procedure and one of the very few securities class actions ever to go to trial and judgment.

Moreover, Mr. Wechsler played an integral role in obtaining a landmark Supreme Court decision in an important phase of that action. See Boeing Co. v. Van Gemert, 444 U.S. 472 (1980).

Robert I. Harwood, a named partner of the Firm, graduated from William and Mary Law School in 1971, and has specialized in securities law and securities litigation since beginning his career in 1972 at the Enforcement Division of the New York Stock Exchange. He has prosecuted numerous securities actions and other class and derivative actions. He is a member of the Trial Lawyers' Section of the New York State Bar Association and has served as a guest lecturer at trial advocacy programs sponsored by the Practicing Law Institute.

Commenting on Mr. Harwood's abilities, Judge Knapp had occasion to state in Blank v. Ronson, 82 Civ. 7443 (S.D.N.Y. June 10, 1985): "Certainly the attorney proposing the settlement has demonstrated his competence ... ." Mr. Harwood was lead attorney in Meritt v. Eckerd, 86 Civ. 1222 (E.D.N.Y. May 30, 1986), where Chief Judge Weinstein observed that counsel conducted the litigation with "speed and skill" resulting in a settlement having a value "in the order of $20 Million Dollars." Mr. Harwood also was in charge of the Hoeniger v. Aylsworth class action litigation in the United States District Court for the Western District of Texas (SA-86-CA-939), which resulted in a settlement fund of $18 million and received favorable comment in the August 14, 1989 edition of The Wall Street Journal ("Prospector Fund Finds Golden Touch in Class Action Suit" p. 18, col. 1). Mr. Harwood served as co-lead counsel in In Re Electro-Catheter Corporation Securities Litigation, 87 Civ. 41 (D.N.J. September 7, 1989), referred to above, and in In Re Interco Incorporated Shareholders Litigation, Consolidated C.A. No. 10111 (Delaware Chancery Court) (May 25, 1990), resulting in a settlement of $18.5 million, where V.C. Berger found, "This is a case that has an extensive record that establishes it was very

4

hard fought. There were intense efforts made by plaintiffs' attorneys and those efforts bore very significant fruit in the face of serious questions as to ultimate success on the merits." Mr. Harwood served as co-lead counsel in In re The Times Mirror Company Shareholders Litigation, (Delaware Chancery Court, November 1994), in which a settlement fund in excess of $20 million was created for the benefit of Times Mirror's shareholders. Mr. Harwood also served as co-lead counsel in In re JWP Inc. Securities Litigation, which resulted in a $37 million settlement fund.

John Halebian, a named partner with the Firm, graduated from Georgetown University (undergraduate) and Villanova Law School where he served on the Law Review as a Case and Comments Editor and as Editor-in-Chief of The Docket, the law school newspaper.

Since graduating from Villanova in 1977, he has specialized in federal and state corporate and commercial litigation with an emphasis on securities litigation. Prior to his becoming a partner with Wechsler Harwood, Mr. Halebian worked approximately six years at another New York City law firm, where he had primary responsibility for handling several large complex federal securities class actions that involved the defense of officers and directors of public companies, and the defense of attorneys and accountants. Some of the cases for which Mr. Halebian had major responsibilities included Den Haene v. Pryor Cashman Sherman & Flynn, et al., 78 CIV. 4360 (CES) (S.D.N.Y.) (a federal securities class action involving an alleged fraudulent coal mining tax shelter limited partnership and over $100 million of deductions), and Kolin v. American Plan, et al., 84 CIV. 4099 (CPS) (E.D.N.Y.) (federal securities class action involving alleged false and misleading statements regarding the financial condition of the company.)

5

Mr. Halebian has also successfully arbitrated to conclusion several securities fraud litigations before the New York Stock Exchange and the American Arbitration Association. Mr. Halebian was lead trial counsel in an A.A.A. arbitration involving a shareholders' derivative action in which he successfully recovered a judgment in favor of the corporation and its shareholders. In addition, Mr. Halebian was lead counsel in a NYSE arbitration regarding customer complaints of churning and suitability claims in which he recovered a money damage award against both the brokerage firm and the broker. Since 1989, Mr. Halebian has recovered approximately $1,000,000 in damages, by way of settlement or award, on behalf of individual investors who have sued major brokerage firms for churning and suitability claims.

Mr. Halebian has served as lead or co-lead counsel or as a member of an executive or steering committee in class action shareholder litigations around the country that were successfully prosecuted to conclusion such as: 1) Howard Savings Bank Securities Litigation, 89-5148 (AMW) (D.NJ 1989) (recovery of $7.6 million in connection with claims alleging false and misleading statements relating to bank loan loss reserves); 2) Avon Products, Inc. Securities Litigation, 89 Civ. 6216 (MEL) (S.D.N.Y. 1989) (recovery of $6.4 million relating to claims alleging false and misleading statements regarding earnings projections); 3) Goldsmith v. Technology Solutions Co., 92 C. 4374 (Judge Manning) (N.D. Ill. 1992) (recovery of $4.6 million in connection with allegations of false and misleading statements regarding revenue recognition policy); and 4) Presidential Life Corp. Securities Litigation, 92 Civ. 6968 (BDP) (S.D.N.Y. 1992) (recovery of $1.7 million relating to allegations of false and misleading statements regarding valuation of junk bonds in insurance company investment portfolio). More recently, Mr. Halebian was one of the lead attorneys in one of several actions pending in both

6

federal and state court against NationsBank regarding its sales of securities to bank customers, which collectively settled (in 1995 and 1998) for approximately $60 million.

Joel C. Feffer, one of the founding members of the firm, was the partner supervising the litigation of In re Home Shopping Network, Inc., Derivative Litigation, (S.D. Fla.) (settlement benefit in excess of $20 million), and Edge Partners, L.P. v. Dockser, et al., (D. Md.) (settlement benefit in excess of $11 million). In addition, Mr. Feffer was in charge of the successful prosecution of the Regeneron Pharmaceuticals, Inc. Securities Litigation in the Southern District of New York (settlement fund in excess of $4 million) and Croyden Assoc. v. Tesoro Petroleum Corp., et al., (Del. Ch.) (settlement benefit of $19.2 million on behalf of holders of preferred stock of Tesoro Petroleum Corp.).

Mr. Feffer graduated from Georgetown University Law Center in 1967 and specialized in corporate law and securities litigation. Mr. Feffer is a member of both the New York State and American Bar Associations.

Andrew D. Friedman, a partner of the Firm, is a Phi Beta Kappa and Magma Cum Laude graduate of George Washington University. Mr. Friedman graduated with honors from New York University School of Law in 1985, and has since specialized in corporate and securities litigation, including numerous class and derivative actions.

Mr. Friedman has recently concentrated much of his efforts on actions brought on behalf of limited partners of public limited partnerships and has played a primary role in numerous other litigations in which Wechsler Harwood acted as lead counsel, wherein substantial benefits were conferred upon shareholders, such as Katz, et al. v. Pels, et al., 90 Civ. 7787 (S.D.N.Y.),

a derivative action, brought on behalf of Lin Broadcasting Corporation, that was settled by defendants' agreement to provide the company with cash and benefits worth in excess of $11.5 million, <u>Katz, et. al. v. Hay (LTV Corp.)</u>, 86 Civ. 5640 (S.D.N.Y.) ($9.5 million settlement fund), <u>In re American Savings Bank F.S.B. Litigation</u>, 90 Civ. 2825 (S.D.N.Y.) ($3.5 million settlement fund), <u>Steiner v. North Fork Bancorporation, Inc., et al.</u>, 91-CV-44 (E.D.N.Y.)($1.3 million settlement fund), <u>Herbert Bush v. The FDI Group, et al.</u>, 93-2484 (Florida Circuit Court) ($17 million settlement fund), and <u>Lewis v. General Employment Enterprises, Inc.</u> ("GEE"), Consol. C.A. No. 90 CH 5953 (Circuit Ct., Cook Cty. Ill. December 1990), in which the Court issued a permanent injunction against the implementation of a Shareholder Rights Plan which was found to violate shareholders' constitutional right to cumulatively vote their shares. In the federal aspect of the litigation against GEE, <u>Lewis v. GEE</u>, No. 91C 0291 (N.D. Ill. January 21, 1991) (Rovner, J.), plaintiff successfully restrained the use of an allegedly false and misleading proxy statement in connection with a proposal to reincorporate the company in Delaware and eliminate important shareholder rights. After the issuance of the Court's ruling, defendants abandoned the proxy statement and the unfavorable proposal.

Jeffrey M. Haber, a member of the Firm, is a <u>Phi Beta Kappa</u> and <u>Magna Cum Laude</u> graduate of the State University of New York at Buffalo, and a 1988 graduate of Hofstra University School of Law. Mr. Haber is a member of the Bar of the State of New York and is also admitted to the United States District Courts for the Southern and Eastern Districts of New York, and the United States District Court for the District of Arizona.

Mr. Haber has played a significant role in numerous actions in which Wechsler Harwood served as lead or co-lead counsel, wherein substantial benefits were conferred upon plaintiff shareholders, such as In re Nuveen Fund Litig., (N.D. Ill.) (settlement fund in excess of $24 million); In re Archer-Daniels-Midland Shareholders Litig., (Del. Ch.)(derivative settlement of $8 million, plus corporate governance changes); In re Perkins Family Restaurants L.P. Shareholders Litig., (Del. Ch.) (settlement fund in excess of $6.6 million); Steiner v. Fugelsang, (S.D.N.Y.) (restoration of voting rights resulting in a benefit in excess of $28 million); Edge Partners, L.P. v. Dockser, et al., (D. Md.) (settlement benefit in excess of $11 million); In re Kendall Square Securities Litig., (D. Mass.) (settlement fund in excess of $5 million); In re The Times Mirror Company Shareholders Litig., (Del. Ch.) (settlement fund in excess of $20 million); Utan, et al. v. Hotel Investors Trust, Inc., et al., (S.D. Cal.) (settlement fund in excess of $4 million).

Prior to joining Wechsler Harwood in December 1991, Mr. Haber represented both plaintiffs and defendants in securities and commodities litigation and arbitration. Mr. Haber has concentrated his practice in the following fields: securities, antitrust, consumer protection, and shareholder rights.

Matthew M. Houston, a member of the Firm, graduated from Boston University School of Law in 1988. Mr. Houston is a member of the Bar of the State of New York and the Commonwealth of Massachusetts. Mr. Houston is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and the District of Massachusetts.

Since his affiliation with Wechsler Harwood in 1992, Mr. Houston has concentrated his practice exclusively in the field of shareholder rights.

Mr. Houston has played a principal role in numerous class actions wherein substantial benefits were conferred upon plaintiffs: Pace American Shareholder Litigation, 94-92 TUC-RMB (securities fraud class action settlement resulting in a recovery of $3.75 million); In re Bay Financial Securities Litigation, Master File No. 89-2377-DPW, (J. Woodlock) D. Mass. (settlement of action based upon federal securities law claims resulting in class recovery in excess of $3.9 million); Goldsmith v. Technology Solutions Company, 92 C 4374 (J. Manning) N.D. Ill. 1992 (recovery of $4.6 million as a result of action alleging false and misleading statements regarding revenue recognition); Crandon Capital Partners v. Sanford M. Kimmel, C.A. No. 14998 (J. Chandler) Del. Ch. 1996 (settlement of an action on behalf of shareholders of Transnational Reinsurance Co. whereby acquiring company provided an additional $10.4 million in merger.)

Daniella Quitt, a member of the Firm, graduated from Fordham University School of Law in 1988, is a member of the Bar of the State of New York, and is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and Fifth Circuit Court of Appeals.

Ms. Quitt has played a significant role in numerous actions in which Wechsler Harwood served as lead or co-lead counsel, wherein substantial benefits were conferred upon plaintiff shareholders, such as In re JWP Inc. Securities Litigation, (S.D.N.Y.) ($37 million settlement fund); In re Home Shopping Network, Inc., Derivative Litigation, (S.D. Fla.) (settlement benefit in excess of $20 million); In re Sears Roebuck and Co. Derivative Litigation,

(Sup. Ct. N.Y. County) (settlement benefit of $8.25 million and therapeutics); In re Rexel Shareholder Litigation, (Sup. Ct. N.Y. County) (settlement benefit in excess of $38 million); and Croyden Assoc. v. Tesoro Petroleum Corp., et al., (Del. Ch.) (settlement benefit of $19.2 million).

Prior to joining Wechsler Harwood in May 1991, Ms. Quitt represented both plaintiffs and defendants in complex commercial litigation. Since her affiliation with Wechsler Harwood, Ms. Quitt has focused her practice on shareholder rights but continues to handle general commercial litigation.

Samuel K. Rosen, a member of the Firm, graduated Princeton University in 1965 and cum laude from Harvard Law School in 1968. Mr. Rosen has had extensive experience in securities class action litigation, as well as complex corporate and commercial litigation. Mr. Rosen has also represented public and private companies in matters of general corporate concern. In 1979, Mr. Rosen argued in the United States Supreme Court, and won, the landmark case, Park Lane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979).

James G. Flynn, a member of the Firm, graduated cum laude from Fordham College in 1980 and cum laude from St. John's School of Law in 1988. Mr. Flynn is a member of the Bar of the State of New York and is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and to the United States Court of Appeals for the Fifth Circuit. Prior to joining Wechsler Harwood Halebian & Feffer LLP, Mr. Flynn represented both plaintiffs and defendants in commercial and securities litigations and in class actions.

Frederick W. Gerkens, III is an associate at the Firm. He graduated from New York Law School, cum laude, and received an L.L.M. Degree in Corporate Law, cum laude,

at Fordham University School of Law in 1997. Mr. Gerkens is also a Certified Public Accountant and holds an M.B.A. from Temple University. Before joining the Firm, Mr. Gerkens practiced in the fields of commercial litigation and employment law and worked at the United States Securities and Exchange Commission in Washington, D.C. Prior to practicing law, Mr. Gerkens obtained extensive experience in auditing, financial reporting, corporate finance and securities broker-dealer regulation. Mr. Gerkens was previously employed at PaineWebber Incorporated as a vice president of corporate reporting and prior to that as an auditor at Coopers & Lybrand, LLP. Mr. Gerkens is a member of the Bar of the State of New York and the American Institute of Certified Public Accountants. He is also admitted to the United States District Courts for the Southern and Eastern Districts of New York.

Scott A. Kamber, an associate at the Firm, graduated with University and Departmental Honors from The Johns Hopkins University in 1986. Mr. Kamber graduated cum laude from University of California, Hastings College of the Law in 1991 where he was Order of the Coif, Articles Editor for Hastings Constitutional Law Quarterly and a member of the Moot Court Board. Mr. Kamber has extensive courtroom experience and has tried over 15 cases to verdict. Prior to joining Wechsler Harwood, Mr. Kamber represented both plaintiffs and defendants in a wide range of commercial litigation and has played a principal role in numerous employment discrimination suits. Mr. Kamber is admitted to practice in the State of New York as well as the Federal Courts in the Southern and Eastern Districts of New York. He is also admitted to practice before the United States Court of Appeals for the Second Circuit. Prior to practicing law, Mr. Kamber was a financial consultant.

12

Jeffrey B. Silverstein is an associate with the Firm. He graduated from New York University in 1985 with University and Departmental honors, including the Founder's Day Award, the highest academic honor bestowed by the University. Mr. Silverstein graduated from New York Law School's Accelerated Program in 1991. Mr. Silverstein is a member of the Bar of the State of New York and the Florida Bar, and is also admitted to the United States District Courts for the Southern and Eastern Districts of New York. Prior to joining Wechsler Harwood, Mr. Silverstein represented plaintiffs in mass tort, shareholder class action and derivative litigation. Since his affiliation with Wechsler Harwood, Mr. Silverstein has concentrated his practice in the field of shareholder rights.

# SCHOENGOLD & SPORN, P.C.

## FIRM BIOGRAPHY

Schoengold & Sporn, P.C. has specialized in securities fraud the past thirty-five years. During that time, the firm has litigated dozens of highly complex class actions throughout the country and has helped recover hundreds of millions of dollars for injured shareholders, including the highly publicized Wedtech securities case, in which Schoengold & Sporn served as a member of the Executive Committee. The favorable $$77.5 million Wedtech settlement was reported in the <u>Wall Street Journal</u> of February 10, 1992, page B6, as a:

> 77.5 million settlement . . . reached in a securities fraud case stemming from the Wedtech scandal. . . The settlement with 29 defendants . . . is believed to be one of the largest ever in a civil securities fraud case. . . "This is a global settlement," said Samuel Sporn, a plaintiffs' attorney at the New York law firm Schoengold & Sporn. Mr. Sporn said the settlement represents almost half of the more than $160 million in stocks and bonds that Wedtech sold to the public between 1983 and 1986.

Since the enactment of the Private Securities Litigation Reform Act of 1995 – which legislation sought to increase the role of institutional investors in securities fraud litigation – the firm has established itself as a leading representative of Taft-Hartley pension funds in this area of the law. Currently Schoengold & Sporn is counsel of record to several such pension funds in pending securities fraud cases.

Schoengold & Sporn has always put the interests of the class it represents ahead of expediency and therefore has been able to obtain substantial recoveries for its clients. In addition, federal courts throughout the country have long noted the firm's experience and skill in complex securities litigation. Among the cases in which the firm successfully recovered a large percentage of the claimed damages and in which firm's credentials were recognized are:

> *Kriegel v. Pacific Scientific Co.*, 98-CV-4163 (C.D. Cal.): in a case in which the class received approximately 27 percent of their claimed maximum damages (which was 25 times defendants' estimation of damages), Judge Morrow concluded that the firm's

"significant expertise" and the "hard fought" settlement that was obtained "on the eve of trial" directly contributed to the case's "positive outcome."

*In re Anadigics, Inc. Securities Litigation*, 98-917 (D.N.J.): in a case in which the class received approximately 44 percent of their legally recoverable damages, Magistrate Judge Wolfson praised the firm's achievement in resolving a difficult and complex case "without prolonging the litigation" and noted that the attorneys handling the matter were "well respected and experienced practitioners."

*In re Versatility, Inc. Securities Litigation*, 98-CV-1676 (S.D.N.Y.): Judge Sprizzo commended the firm for negotiating a settlement that "reflects . . . the best interests of the shareholders and the intelligence of the lawyers."

*In re Datascope Corp. Securities Litigation*, Civil No. 93-4954 (WGB),: Judge Basslerof the United States District Court for the District of New Jersey observed: "I have been continually impressed with the quality of the work in the case. . . in terms of the way this matter was handled, the professionalism, quality of the legal work, I've never seen anything better, so and for that I'm very grateful to everybody."

*IDI Securities Litigation*, 84-CV-3870 (S.D.N.Y.): shareholders received over 95% of their recognized losses. Judge Broderick stated that the legal work done on behalf of the class was "excellent" and "the result was an excellent result."

The firm served as lead or co-lead counsel in numerous cases through which defrauded investors obtained substantial recoveries, including the following:

*In re Wedtech Securities*, 86 Civ. 8628 (S.D.N.Y.) ($77.5 million recovery).

*Polar International Brokerage Corp. v. Corroon & Black Corp.*, Index No. 18577/90, (Sup. Ct. N.Y. Co.) ($52 million recovery).

*In re JWP Securities Litigation*, 92 Civ. 5815 (S.D.N.Y.) ($36 million recovery).

*In re First Investors Securities Litigation*, 90 Civ. 7225 (S.D.N.Y.) ($33 million recovery).

*In re DSC Communications Corp. Securities Litigation*, 85-2005-T (N.D. Tex.) ($30 million recovery).

*Stern v. Jerome* and *Fisher Bond Fund v. Davis* (SpectraVision Securities Litigation), 3:94 CV-2236 and 3:95 CV-3062-D (N.D. Tex.) ($28.2 million recovery).

*In re ProNet Securities Litigation*, 3:96-CV-1795-P (N.D. Tex.) ($15 million recovery).

*Kriegel v. Pacific Scientific Corp., et al.*, 98-4163 (C.D. Cal.) ($14.8 million recovery).

*In re Anadigics, Inc. Securities Litigation*, 98-917 (D. N.J.) ($11.5 million recovery).

*In re Datascope Corp. Securities Litigation*, 93-4954 (D. N.J.) ($10.5 million recovery).

*Kassover v. Coeur d'Alene Mines Corporation Securities Litigation*, 92-0015-N-(HLR) (D. Ohio) ($5.875 million recovery).

*In re Versatility, Inc. Securities Litigation*, 98-CV-1676 (S.D.N.Y.) ($4.625 million recovery).

*In re Alcohol Testing of America, Inc. Securities Litigation*, SA CV 92-123 LHM (JRX) ($ 4.6 million recovery).

*Roberts and Silverman v. U.S. Homecare Corp. Securities Litigation*, 93 Civ. 4060 (S.D.N.Y.) ($3 million recovery).

## THE ATTORNEYS OF SCHOENGOLD & SPORN, P.C.

**Samuel P. Sporn** is a graduate of the Brooklyn Law School, Class of 1953, where he distinguished himself as Editor-in-Chief of the Brooklyn Law Review and Class Valedictorian. He was admitted to practice in New York State in 1953, admitted to the bars of the Southern and Eastern Districts of New York in 1956, and thereafter admitted to the bars of the Supreme Court of the United States and the Second, Ninth and Washington, D.C. Circuit Courts of Appeal. Mr. Sporn served in the United States Army from 1953 to 1955 in the Judge Advocate General's Office. Thereafter, he was an attorney with the Port Authority of New York, and in 1956, became an associate at Israel & Taubenblatt in New York City, a firm specializing in tort and admiralty law. In 1959, Mr. Sporn began his own general practice, and in 1962, he co-founded the present firm of Schoengold & Sporn, P.C., which practiced general commercial law until it began specializing in securities law in 1968. He is an Adjunct Associate Professor of Law at the Brooklyn Law School, where he teaches a seminar in Federal and New York State Civil Practice. He has also lectured on class actions and the federal securities laws in various law schools in the metropolitan area.

**Joel P. Laitman** graduated from Columbia University in 1981 with a B.A. degree, *magna cum laude*, and received his J.D. degree from the Georgetown University Law Center, Washington, D.C. in June, 1986. Thereafter, he was associated with the firm of Shea & Gould, one of the largest law firms in New York City, practicing in the field of general commercial litigation. In December, 1988, he became associated with the firm of Bernstein, Litowitz, Berger & Grossmann, specializing in federal securities class action litigation. In March 1992, he joined the firm of Schoengold & Sporn, P.C.

**Christopher Lometti** graduated from Fordham College in 1983 and Fordham Law School in 1986. While attending law school, Mr. Lometti interned with the United States Attorney's Office for the Eastern District of New York and clerked for Judge Jack Mackston of the Civil Court of the City of Long Beach. From 1986 through 1994, he was an associate in the Litigation Department of the New York Office of Shea & Gould.

From 1994 through 1996, he was a sole practitioner, specializing in commercial litigation and securities arbitrations. Since September 1996, he has been affiliated with Schoengold & Sporn, P.C. He was admitted to the New York Bar in February 1987 and is also admitted in the Southern and Eastern Districts of New York, the District of Columbia and the U.S. Court of Appeals for the Second Circuit. He is a member of the American Bar Association and the New York County Lawyers Association, and he also serves as an arbitrator for the National Association of Securities Dealers and the New York Stock Exchange.

**Kurt Hunciker** is admitted to practice in the State of New York (1979), and is also admitted to practice in the United States District Courts for the Southern, Eastern and Northern Districts of New York and the United States Courts of Appeal for the Second, Fourth and Ninth Circuits. Mr. Hunciker is a 1975 graduate of Stanford University and a 1978 graduate of Harvard Law School, where he served as a founding editor of the Harvard Environmental Law Review. Mr. Hunciker's practice is concentrated in complex business and securities litigation. He has represented clients in a number of class actions and cases brought under Section 10(b) of the Securities Act of 1934 and the Racketeer Influenced and Corrupt Practices Act, as well as actions brought under the federal antitrust and patent laws. Mr. Hunciker was an associate and then a partner of the New York City law firm of Shea & Gould from 1978 through 1994, and is a member of Phi Beta Kappa.

**Jay P. Saltzman** graduated from Columbia University in 1983 with a Bachelor of Arts degree where he was on the Dean's List throughout his attendance. From 1985-1990, Mr. Saltzman worked as an officer in the Corporate Trust department of the Bankers Trust Company, responsible for all aspects of Corporate Trust, from integrating new issues to ensuring the accuracy of dividends and stock splits. Mr. Saltzman earned a Masters of Business Administration degree with a major in Corporate Finance from New York University's Stern School

of Business in 1991. He received his J.D. degree from the Benjamin N. Cardozo School of Law in June, 1994. Mr. Saltzman was a member of the *Cardozo Law Review* for which he wrote his Note on International and Labor Law. While at Cardozo, he was an intern with the New York State Attorney General's Office and with the Lawyers' Committee for Human Rights. He is admitted to practice in the courts of the States of New York and New Jersey, in the Southern and Eastern Districts of New York, and the District of New Jersey.

**Ashley Kim** graduated *cum laude* from Barnard College in 1994 with a Bachelor of Arts degree and was on the Dean's List throughout her attendance. Ms. Kim received her J.D. degree from Brooklyn Law School in June, 1999, where she was a member of the Criminal Procedure Moot Court team and the Moot Court Honor's Society. While at Brooklyn Law School, Ms. Kim received two CALI Excellence Awards for Legal Writing (1996-97). She is currently admitted to practice law in the State of New Jersey and the United States District Court of New Jersey.

**Cheryl Hamer Mackell** (of-counsel) is admitted to practice in the State of California (1984) and the District of Columbia (1989). She is also admitted to the bars of the United States District Courts for the Northern, Southern, Eastern and Central District of California, the United States Courts of Appeal for the Second, Third, Fourth, Seventh, Ninth, Tenth and Eleventh Circuits and the Supreme Court of the United States. Ms. Hamer Mackell is a 1973 graduate of Columbia University and a 1983 graduate of Lincoln University Law School. She studied tax law at Golden Gate University in 1984. Ms. Hamer Mackell's practice experience has included litigation at both the State and Federal levels in complex Racketeer Influence and Corrupt Organizations (RICO) and Continuing Criminal Enterprise (CCE) cases, death penalty litigation, business and non-profit corporate law, and more recently, securities fraud class action litigation. She was an Adjunct Professor at Pace University, Dyson College of Arts and Sciences and The Graduate School of Public Administration from 1996 to 1998.

3

Ruth Hershman, a paralegal at Schoengold & Sporn, P.C., graduated from Kingsborough Community College in March 1984, where she obtained a Certificate of Completion in the Paralegal Program and Legal Research and Brief Writing. Since 1983, Ms. Hershman has been specializing in paralegal work involving federal and state securities class actions.

Jacqueline McNeil, a paralegal at Schoengold & Sporn, P.C., obtained a Certificate of Completion in the Paralegal Program at the New York Paralegal School in March 1996. Prior to joining Schoengold & Sporn, P.C., Ms. McNeil spent seven years in the Real Estate department of Chase Manhattan Bank analyzing and evaluating contracts.

# QUINLAN & CRISHAM, LTD. CLASS ACTION EXPERIENCE

*Quinlan & Crisham, Ltd.* is a firm of forty trial and appellate attorneys dedicated to providing high-quality and cost-effective legal representation for its clients. The firm has extensive experience in class action and complex litigation, including securities class action litigation, and has represented both plaintiffs and defendants in consumer fraud, civil rights, constitutional law, and other complex legal class action matters. The following list highlights the litigation in which Quinlan & Crisham, Ltd. has been involved:

- *Green v. Washington*; No. 93 C 7300, previously before the Honorable Judge Shadur. This class action was brought by convicted felons serving time in the Illinois penal system who sought damages for violations of their civil rights. Quinlan & Crisham, Ltd. represented the Justices of the Illinois Appellate Court who were defendants in this class action.
- *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, No. 98 03287, currently pending before the Honorable Judge Weinstein in the United States District Court for the Eastern District of New York. This multi-billion dollar litigation was brought by a group of health plans attempting to recover for increased costs in health care caused by tobacco smoke. Quinlan & Crisham, Ltd. represent the plaintiffs in this case who are pursuing causes of action under anti-trust, RICO, subrogation, and other theories of law.
- *Health Care Service Corp. v Philip Morris, Inc.*, No. 98 C 2612, currently pending in the Seventh Circuit, and previously before the Honorable Judge Bucklo. This multi-billion dollar litigation was brought by a group of health plans attempting to recover for increased costs in health care caused by tobacco smoke.
- *Morrow, et al. v. LaSalle-Talman, et al.*, No. 96 CH 11208, currently pending before the Honorable Judge Jaffe. This is a class action brought by the former shareholders of Talman Bank F.S.B. against various of its officers, directors, and professionals relating to misrepresentations in disclosure materials Quinlan & Crisham, Ltd. represents the plaintiff class of former shareholders of Talman Bank F.S.B.
- *Robinson v. Toyota Motor Credit Corporation*, No. 95 M3 3372, currently pending in the Illinois Appellate Court, and previously before the Honorable Judge Getty. Quinlan & Crisham, Ltd. represented the defendants in this consumer fraud class action.
- *Pawlikowski v. Toyota Motor Credit Corporation*, No. 94 L 0289, currently pending in the Illinois Supreme Court, and previously before the Honorable Judge Equi in the Circuit Court of Dupage County. Quinlan & Crisham, Ltd. represents the defendants in this consumer fraud class action.
- *Avery v. State Farm*, No. 97 L 114, previously before the Honorable Judge Speroni in the Circuit Court of Williamson County. Quinlan & Crisham, Ltd. acted as defendants' appellate counsel in this consumer fraud class action.

# CURRICULUM VITAE
## OF
## WILLIAM R. QUINLAN
## <u>QUINLAN & CRISHAM, LTD.</u>

Mr. Quinlan graduated from Loyola University of Chicago with a B.S.C. in accounting in 1961. While in the business school, he was selected for membership in Beta Alpha PSI, National Honor Accounting Fraternity, and Phi Signa Tau, National Honor Society in Philosophy. Thereafter, Mr. Quinlan attended Loyola Law School where he was selected as a member of the Blue Key National Honor Society and graduated cum laude receiving a J.D. degree in 1964. During law school, he was an Associate Editor of the Law Review Activity. He has also attended courses at Harvard and Northwestern Law School and is a graduate of the National Judicial College. In May 1988, Mr. Quinlan received a Master of Laws degree from the University of Virginia School of Law. In addition, Mr. Quinlan graduated from the Appellate Judges Seminar, Institute of Judicial Administration, held at New York University School of Law.

After graduating from law school, Mr. Quinlan served in the United States Army attaining the rank of Captain.

His legal experience includes serving as a Senior legal assistant for the Illinois Supreme Court; 1st Assistant Corporation Counsel of Chicago; General Counsel, Chicago Urban Transportation District; and, General Counsel for the Chicago Building Commission. In 1975, Mr. Quinlan was appointed Corporation Counsel for the City of Chicago by Mayor Richard J. Daley and served in that position under Mayor Daley, Mayor Michael Bilandic and Mayor Jane Byrne. In 1980, he was elected a Circuit Court Judge.

As a Judge of the Circuit Court of Cook County, State of Illinois, he served in the Trial Section, as a contested Motion Judge, and, as a Motion of Course Judge. During his tenure as a Circuit Court Judge, he presided over pretrial and trial matters in complex litigation, including the Asbestos litigation in Cook County, the Jewel Salmonella litigation, the Union Oil Explosion, and the Horizon Stadium Collapse. As a Judge, Mr. Quinlan tried the first Asbestos case tried in Cook County, it was affirmed on appeal to the Illinois Appellate Court and ultimately (by a divided court) affirmed by the Illinois Supreme Court.

On June 26, 1985, Mr. Quinlan was appointed to the Illinois Appellate Court by the Supreme Court of Illinois. In November of 1986 Mr. Quinlan was elected as an Appellate Justice, beginning his new term of office on December 1, 1986. He also served as the Presiding Judge of the First Division of the First District Appellate Court and was later a member of the Court's Executive Committee.

His legal teaching experience includes teaching at John Marshall Law School, Loyola School of Law, and DePaul College of Law in Chicago. Mr. Quinlan has taught Professional Ethics and Complex Litigation at DePaul College of Law, State Constitutional and Local Government Law at Loyola, and Trial Practice at Northwestern University. Presently, he serves as an instructor in the Trial Advocacy Workshop Program at Loyola Law School and teaches the Trial Practice course at John Marshall Law School. He has periodically lectured at various Judicial Conferences and continuing legal education programs. Mr. Quinlan is a faculty member of the National Judicial College in Reno, Nevada, and also is a member of the National Judicial College's Council For The Future. Additionally, he has participated as a faculty member in the Appellate Judges Seminar at New York University School of Law. Mr. Quinlan is Chairman of the Illinois Supreme Court Committee on Professional Responsibility. He also works with other agencies and independently as a mediator or arbitrator, and has served as a court-appointed Guardian, arbitrator and court Receiver.

Mr. Quinlan has been a member of the Board of Managers of the Chicago Bar Association and has served as Chairman of the Chicago Bar's Committee on the Development of Law and as a member of the Board of Editors of the "Chicago Bar Record." He is also a member of the Illinois Bar Association, the American Bar Association, and the 7th Circuit Bar Association. He is a former director of the Illinois Appellate Lawyers Association and a former Trustee and Vice President of NIMLO (National Institute of Municipal Law Officers), which is the national association of city attorneys. Mr. Quinlan has served as Chair of the Illinois State Bar Association's Committee on Judicial Appointments and Evaluations. In April, 1991, Mr. Quinlan was appointed as Chairman of the Judicial Advisory Council of Cook County by the President of the Cook County Board of Commissioners and continues to serve in that role. In January, 1992, he was appointed the Parliamentarian for the Cook County Board of Commissioners. Mr. Quinlan also serves as Special Counsel to the President of the Board of Commissioners of Cook County. In 1994, he was named one of the city's top lawyers by *Chicago* magazine. In September, 1995, Mr. Quinlan was appointed Judicial Liaison of the Illinois State Bar Association. In June, 1997, he was appointed Chairman of the newly created Access To Justice Advisory Board of the Illinois State Bar Association. Mr. Quinlan is a member of the Society of Trial Lawyers. Additionally, he serves on the Board of Advisors for Mundelein Seminary at the University of St. Mary of the Lake. He is also a member of the Economic Club of Chicago and the Rotary Club of Chicago.

Mr. Quinlan has been a member of the Supreme Court of Illinois Committee on Character and Fitness and the Supreme Court's Committee on Rules and on its special Committee on Protracted/Complex Litigation where he has served as Vice-Chair. Mr. Quinlan is the co-author of an Appellate Practice Manual, <u>Illinois Civil Appellate Practice -- State and Federal</u>, published in 1993.

Mr. Quinlan was admitted to practice in Illinois in 1964 and has also been admitted as a member of the bar of the United States Supreme Court, United States Court of Military Appeals, United States Court of Claims, United States Court of Appeals, (7th Circuit), and the United States District Court for the Northern District of Illinois.

On November 2, 1989, Mr. Quinlan retired from judicial service to join the litigation firm of Phelan, Pope & John, Ltd., subsequently known as Phelan, Cahill & Quinlan, Ltd., as a Partner. In September, 1993, he was elected as a member of the firm's Executive Committee.

In February of 1996, Mr. Quinlan left the firm of Phelan, Cahill & Quinlan, Ltd. to start his own firm with Thomas M. Crisham, which is known as Quinlan & Crisham, Ltd. The Quinlan & Crisham firm is a commercial litigation firm located in Chicago, Illinois of approximately 40 litigation attorneys. In private practice, Mr. Quinlan has been involved in corporate government, commercial and class action litigation.

# CURRICULUM VITAE
## OF
## CAESAR A. TABET
## QUINLAN & CRISHAM, LTD.

**CAESAR A. TABET** joined QUINLAN & CRISHAM as a founding partner in February 1996 after working with William Quinlan for six years at Phelan, Cahill & Quinlan, Ltd. He is a former Law Clerk to the Honorable John A. Nordberg, Judge for the United States District Court, Northern District of Illinois.

Tabet practices in the area of complex civil litigation and appellate practice, including corporate and commercial litigation, real estate litigation, trust litigation, and constitutional law and class action litigation. He has authored numerous articles and lectured on various topics relating to complex civil litigation.

Tabet has tried numerous cases to judgment and verdict. He is a member of the Federal Trial Bar. He also is a member of the Chicago Bar Association, the Illinois State Bar Association, and the American Bar Association, Business Litigation Section.

Tabet received a B.A. degree, with honors, from St. John's University in Collegeville, Minn., in 1982, and a J.D. degree, with honors, from the University of Minnesota Law School in 1987, where he was an editor of the Law Review.

## CURRICULUM VITAE
## OF
## WILLIAM JOHN QUINLAN
## QUINLAN & CRISHAM, LTD.

**WILLIAM JOHN QUINLAN** joined QUINLAN & CRISHAM from Gardner, Carton & Douglas, a 200-lawyer full service firm based in Chicago. Illinois. Quinlan was a member of the Litigation Department and prior to joining Gardner, Carton & Douglas, spent three years as a staff member of the Ways and Means Committee of the United States Congress. While a member of Ways and Means' staff, Quinlan worked on the development and implementation of such issues as National Health Care, Social Security reform, and the North American Free Trade Agreement.

Before joining the Ways and Means Committee staff, Quinlan served as a member of the Appropriations Staff of Illinois House Speaker, Michael J. Madigan, where he analyzed and reviewed the budgets of all State agencies, presented those budgets to the various legislative Committees, and assisted in their passage before the General Assembly.

As an attorney, Quinlan represented Cook County Clerk David Orr before the Circuit, Appellate and Supreme Court of Illinois in a challenge to a State Statute eliminating a voter's right to cast a straight party vote. Quinlan also has represented the Democratic National Convention Committee in litigation related to the 1996 Democratic National Convention.

Quinlan serves as Corporate Counsel and as a member of the Board of Directors to the Police Services. Inc., a charitable organization that provides assistance to police officers and their families when an officer is injured in the line of duty.

Quinlan received his J.D. from Georgetown Law School in 1995, where he served as a member of the finance committee which was responsible for administering the school's $44 million annual budget. While at Georgetown, Quinlan also served as the Notes and Comments Editor of the *Georgetown Immigration Law Review*. He received his B.A. in Political Science from the University of Illinois in 1992.

William John Quinlan is presently a member of the American, Illinois and Chicago Bar Associations. He currently serves as a member of the Illinois State Bar Association's Judicial Evaluation Committee which reviews all judicial candidates and rates their qualifications to serve as a judge.

# CURRICULUM VITAE
## OF
## ERIN BOLAN HINES
## QUINLAN & CRISHAM, LTD.

ERIN BOLAN HINES joined QUINLAN & CRISHAM as an associate in August 1998. She practices law in the areas of commercial law, appellate practice and ERISA.

Prior to joining Quinlan & Crisham, she was a law clerk at Kevin M. Forde, Ltd., a civil litigation firm with an emphasis on commercial litigation. From August 1996 to February 1997, she was a law clerk to the Honorable Thomas R. Fitzgerald, presiding judge of the Circuit Court of Cook County Criminal Division. She was a court coordinator for two years with the Circuit Court of Cook County where she served as a liaison between judges and attorneys.

Bolan Hines received a B.A. degree in May 1991 from the University of Wisconsin at Madison where she made the Dean's List. She attend Loyola University School of Law and was articles editor of the *Loyola Consumer Law Review*.